IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>TATYANA MAZIK, Debtor<br><br>CHICAGO TITLE INSURANCE CO., Movant<br><br>v.<br><br>TATYANA MAZIK, Debtor/Respondent | NO.<br><br>CHAPTER 13<br><br>COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §523(a)(2)(A) AND §523(a)(6) |

Chicago National Title Insurance Company ("Chicago"), by and through its undersigned counsel, hereby files this Complaint against Tatyana Mazik a/k/a Tatyana Skylar, the debtor (hereinafter "Mazik," "Debtor," or "Defendant"), to determine the non-dischargeability of debt pursuant to 11 U.S.C. §523. Fidelity requests entry of a non-dischargeability judgment against the Debtor for the full amount of the debt (including, but not limited to, principal, interest, costs and attorneys' fees) determined to be owing to Chicago as a debt pursuant to 11 U.S.C. §101(12) and determined to be non-dischargeable pursuant to 11 U.S.C. §523. For its Complaint against the Debtor, Chicago alleges as follows:

## PARTIES

1. Plaintiff, Chicago, is a Florida corporation duly registered to conduct business in Pennsylvania. Under the facts and circumstances alleged in this Complaint, Chicago holds an unsecured claim against the Debtor pursuant to 11 U.S.C. §101(5), and therefore the Debtor is obligated for a debt pursuant to 11 U.S.C. §101(12).

2. Defendant, Mazik, is an individual residing in the Commonwealth of Pennsylvania.

## JURISDICTION

3. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §157 and §1334 because this matter arises under 11 U.S.C. §523.

4. The instant Complaint presents a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I), in which the Court has jurisdiction to enter a final judgment.

5. The instant Complaint commences an adversary proceeding under Fed. R. Bankr. P. 7001(6) that relates to the Chapter 7 bankruptcy case of the Debtor currently pending before this Court at No. 18-10643-elf.

## VENUE

6. Venue is proper in this District under 11 U.S.C. §1409(a) because the Debtor's Chapter 7 bankruptcy case is pending in this District.

## GENERAL ALLEGATIONS

7. Defendant is the former owner of real property commonly known as 102 Horseshoe Lane, North Wales, PA. ("the Horseshoe Lane Property").

8. Defendant is the former owner of real property known as 1477 Rockwell Road, Abington, PA 19001-2623 ("the Rockwell Road Property").

9. Defendant also claims she owns a 1/3 unrecorded interest in the real property commonly known as 1269 Waller Drive in Huntingdon Valley, PA.[1]

*The Horseshoe Lane Property*

10. Upon information and belief, in early 2005, Yuriy Mazik, husband of Defendant, purporting to act as a licensed real estate agent on behalf of Susan and Philip

---

[1] In her Chapter 7 petition filed in 2017 at Docket No. 17-12125, Mazik claimed a 50% unrecorded interest.

2

Shapiro ("the Shapiros"), negotiated their purchase of the Horseshoe Lane Property from Eugenia Menis ("Menis").

11. Upon information and belief, Yuriy Mazik also agreed to arrange for the Shapiros to obtain a mortgage loan to finance their purchase of the Horseshoe Lane Property.

12. Upon information and belief, Yuriy Mazik was not a licensed real estate saleperson, nor was he a licensed mortgage broker.

13. Upon information and belief, the Shapiros paid a $40,000 deposit under the agreement with Menis.

14. Upon information and belief, on the scheduled date of the closing for the purchase of the Horseshoe Lane Property, Yuriy Mazik told the Shapiros for the first time that they had not qualified for a loan to finance the purchase and that they would be unable to close.

15. Upon information and belief, the Shapiros had already sold their residence and needed to close on the Horseshoe Lane Property so that they had a home in which to live. They also risked losing their $40,000 deposit if the sale did not close.

16. Yuri Mazik told the Shapiros that he could solve their problem as follows:

a. Menis would sell the Property to Yuriy Mazik's wife, Defendant, Tatyana Mazik, who would obtain a loan and mortgage to pay for the purchase while using the Shapiros' $40,000 deposit as part of the purchase price;

b. The Shapiros would live at the Property while they paid Tatyana Mazik's mortgage; and

c. The Shapiros would eventually reapply for a loan and mortgage to enable them to purchase the Property from Tatyana Mazik.

17. Upon information and belief, Yuriy Mazik arranged for Tatyana Mazik to purchase the Horseshoe Lane Property from Menis for $412,000 on March 5, 2005.

18. In order to pay for her purchase of the Horseshoe Lane Property, Mazik obtained a purchase money loan from America's Wholesale Lender in the amount of $391,400 ("the Horseshoe Lane Loan") and signed a Promissory Note ("the Horseshoe Lane Note") memorializing the terms of same. A true and correct copy of the Horseshoe Lane Note is attached hereto as Exhibit "A."

19. As security for repayment of the Horseshoe Lane Loan, Mazik promised to give a valid lien of first priority against the Property for America's Wholesale Lender ("AWL"), and its successors and assigns, and she executed a mortgage memorializing the terms of same ("the Horseshoe Lane Mortgage"). A true and correct copy of the Horseshoe Lane Mortgage is attached hereto as Exhibit "B."

20. In connection with the Horseshoe Lane Loan and Mortgage, Chicago issued a lender's policy of title insurance ("the Horseshoe Lane Policy") to America's Wholesale Lender, and its successors and assigns to insure the priority of the Horseshoe Lane Mortgage as a first lien on the Property. A true and correct copy of the Horseshoe Lane Policy Commitment is attached hereto as Exhibit "C."

21. Due to fraud and collusion between Yuriy Mazik, Tatyana Mazik, and the settlement agent they selected to conduct the closing, which was not known to AWL or Chicago at the time, the Horseshoe Lane Mortgage was never recorded.

22. After the May 2005 closing, a deed from Menis to Mazik was recorded by the Montgomery County Recorder of Deeds in Book 5563, Page 436.

23. Upon information and belief, the Shapiros moved into the Property in or around May 2005 and paid the monthly mortgage payments to Countrywide, the assignee of the Mortgage and Note from AWL.

24. Upon information and belief, the Shapiros remained unable to obtain a loan to acquire the property from Tatyana Mazik, and they became concerned about the $40,000 they paid toward the purchase of the Horseshoe Lane Property—by Tatyana Mazik—and their ongoing payments towards the Horseshoe Lane Mortgage without a recorded ownership interest in the Horseshoe Lane Property.

25. As an accommodation, Defendant Mazik gave the Shapiros' daughter, Ashley J. Shapiro, a 50% interest in the Horseshoe Lane Property for the stated consideration of $1.00 by deed dated September 9, 2005.

26. For some unknown reason, Ashley J. Shapiro quitclaimed her 50% interest in the Horseshoe Lane Property back to Defendant Mazik for the stated consideration of $1.00 by deed dated June 30, 2007 and recorded in the Office of the Montgomery County Recorder of Deeds in Book 5654, Page 686.

27. Less than seven months later, Defendant conveyed the Horseshoe Lane Property to Ashley J. Shapiro's father, Philip Shapiro, by way of a deed dated February 14, 2008 for the stated consideration of $440,000, which was recorded in the Office of the Montgomery County Recorder of Deeds as Instrument No. 2008017962.

28. That same day, Shapiro executed a mortgage against the Property and in favor of Emigrant Mortgage Company, Inc. to secure his repayment of a purchase money loan in the amount of $264,000.00 ("the Emigrant Mortgage"), which was recorded on February 26, 2008 in the Montgomery County Commissioner's Registry at Book 12331, Page 01994, as Instrument No. 2008017963.

29. At the time of the sale to Shapiro, Defendant failed to advise the settlement agent about the Horseshoe Lane Mortgage and failed to direct disbursement of any proceeds to satisfy her repayment obligation under the Horseshoe Lane Note.

5

30. Thus, the Horseshoe Lane Loan was not paid off upon the sale to Shapiro; rather, the proceeds from the Emigrant Mortgage purchase money loan were distributed to Defendant Mazik in cash.

31. At or around that same time, Defendant Mazik defaulted on her repayment of the Horseshoe Lane Note, which had been sold to Bank of New York.

32. In connection with Bank of New York's foreclosure efforts, it discovered that Mazik had already sold the Horseshoe Lane Property and taken the sale proceeds without satisfying the Horseshoe Lane Note.

33. Bank of New York also discovered that the Mortgage had not been recorded, and therefore could not foreclose on the Horseshoe Lane Property.

34. Accordingly, Bank of New York tendered a claim to Chicago under the Horseshoe Lane Policy.

35. Chicago accepted coverage and tendered payment in the amount of $385,000.00 to Bank of America fbo Bank of New York (holder of the Note and Mortgage) pursuant to its obligations under the Horseshoe Lane Policy. A true and correct copy of Chicago's payment letter to Bank of America is attached hereto as Exhibit "D."

36. In exchange—and in accordance with the terms of the Horseshoe Lane Policy, Bank of America assigned its interest in the Horseshoe Lane Note and Mortgage to Chicago.

37. Chicago is now the holder of the Horseshoe Lane Note and owner of the Horseshoe Lane Mortgage, but it has been unable to record a written assignment since the Horseshoe Lane Mortgage was not recorded when the Horseshoe Lane Property was sold.

38. Chicago demanded that Defendant satisfy the entire principal amount due and owing to it by letters dated June 13, 2015 and September 16, 2015, but she has failed and refused to do so. True and correct copies of Chicago's demand letters are attached collectively hereto as Exhibit "E."

39.     The Horseshoe Loan Note remains in default for Defendant's failure to make the required monthly repayments, and there is a principal balance due and owing of $376,537.02, together with interest from February 2008, plus fees and costs for a total in excess of $664,376.25.

### The Rockwell Road Property

40.     On or around August 5, 2005, Defendant and her husband, Yuriy Mazik, ("the Maziks") purchased the Rockwell Road Property for the stated consideration of $240,000.00.

41.     In order to pay for the Rockwell Road Property, the Maziks obtained a purchase money loan from AWL in the amount of $216,000 ("the Rockwell Road Loan") and signed a Promissory Note ("the Rockwell Road Note") memorializing the terms of same. A true and correct copy of the Rockwell Road Note is attached hereto as Exhibit "F."

42.     As security for repayment of the loan, the Maziks promised to give a valid lien of first priority against the Property for AWL, and its successors and assigns, and they executed a mortgage memorializing the terms of same ("the Rockwell Road Mortgage"). A true and correct copy of the Rockwell Road Mortgage is attached hereto as Exhibit "G."

43.     In connection with that transaction, Chicago issued a lender's policy of title insurance ("the Policy") to AWL, and its successors and assigns. A true and correct copy of the Policy Commitment is attached hereto as Exhibit "H."

44.     Due to fraud and collusion between the Maziks and others, including the settlement agent, which was not known to AWL or Chicago at the time, the Rockwell Road Mortgage was never recorded.

45.     On December 26, 2006, the Maziks conveyed the Rockwell Road Property to Viktor Lipovoy via Warranty Deed recorded on January 23, 2007 in the Montgomery County Recorder of Deeds at Book 5632, Page 01511 for the purported consideration of $430,000—although it does not appear that he gave a mortgage against the Rockwell Road Property in order to obtain title.

46. Defendant failed to advise the settlement agent about the Rockwell Road Mortgage and failed to direct disbursement of any proceeds to satisfy her repayment obligation under the Rockwell Road Note.

47. Thus, the Rockwell Road Loan was not paid off upon the conveyance to Lipovoy; rather, the proceeds from sale were distributed to Defendant Mazik in cash.

48. Even so, the Maziks continued to make the monthly payments due under the Rockwell Road Note.

49. In the meantime, Viktor Lipovoy conveyed the Property to Scott M. Wargo and Greg A. Farrell via Warranty Deed dated March 24, 2007 and recorded on April 16, 2007 in the Montgomery County Recorder of Deeds at Book 5643, Page 00720 for the stated consideration of $423,750.00.

50. In order to finance their purchase of the Rockwell Road Property, Scott M. Wargo and Greg A. Farrell obtained a purchase money loan from Cartus Home Loans ("Cartus") in the amount of $402,562.50 and granted Cartus a purchase money mortgage against the Property ("the Cartus Mortgage"), which was recorded on April 16, 2007 in the Montgomery County Recorder of Deeds at Book 12084, Page 00237.

51. The Rockwell Road Note was not paid off with the proceeds of the Cartus Mortgage loan upon the sale to Wargo and Farrell.

52. Rather, upon information and belief, all the proceeds from the Cartus Mortgage loan were distributed to Lipovoy and then to the Maziks.

53. Nevertheless, the Maziks continued to make the monthly payments due under the Rockwell Road Note until October 2009.

54. By then, the Rockwell Road Mortgage loan had been sold to Bank of America.

55. In connection with Bank of America's collection efforts, it discovered that the Maziks had already sold the Rockwell Road Property and taken the sale proceeds without satisfying the Rockwell Road Mortgage loan.

56. Bank of America also discovered that the Rockwell Road Mortgage had not been recorded, and therefore Bank of America could not foreclose on the Rockwell Road Property.

57. Accordingly, Bank of America tendered a claim to Chicago under the Rockwell Road Policy.

58. Chicago accepted coverage and tendered payment in the amount of $216,000.00 to Bank of America pursuant to its obligations under the Policy. A true and correct copy of Chicago's check dated December 3, 2015 is attached hereto as Exhibit "I."

59. In exchange—and as required by the Policy, Bank of New York tendered the Rockwell Road Note to Chicago.

60. Upon tender of the Note to Chicago by Bank of America, Chicago became the owner of the Horseshoe Lane Mortgage, but it has been unable to record a written assignment since the Horseshoe Lane Mortgage was not recorded when the Rockwell Road Property was sold.

61. The Rockwell Road Note remains in default for Defendant's failure to make the required monthly repayments, and there is a principal balance due and owing of $188,678.87, together with interest from February 2009, plus fees and costs for a total in excess of $353,702.

**Prior Bankruptcy Proceedings**

62. On July 24, 2012, Defendant filed a Chapter 13 Petition in this Court at Docket No. 12-16989-elf. That case was dismissed for her failure to make plan payments on August 27, 2013.

63. On December 15, 2015, Defendant filed a Chapter 13 Petition in this Court at Docket No. 15-18950-elf. That case was dismissed for her failure to make plan payments on August 23, 2016.

64. On March 28, 2017, Defendant filed a Chapter 7 Petition in this Court at Docket No. 17-

9

12125.

65. In her Schedules, she failed to identify all real and personal property she owns, and failed to identify the aforementioned debts she owes to Chicago under the Horseshoe Lane and Rockwell Road Notes.

66. Chicago filed a non-dischargeability complaint on June 30, 2017 at Docket No. 17-0188.

67. Defendant failed to make required payments, attend a hearing scheduled by the Court, and failed to attend the meeting of creditors so her petition was dismissed on August 21, 2017.

68. As a result, Chicago's adversary action was also dismissed.

**Current Proceedings**

69. On January 31, 2018, Defendant filed a Chapter 13 Petition in this Court at Docket No. 18-10643-elf.

70. Unaware of her pending petition, Chicago filed an action to recover the outstanding balance owed by Defendant under the aforementioned notes she signed in this Court on March 14, 2018 at Docket No. 18-01116.

71. That action is now stayed by virtue of Defendant's pending Chapter 13 petition.

### FIRST CLAIM FOR RELIEF UNDER 11 U.S.C. §523(a)(2)

72. Plaintiff repeats and realleges the preceding paragraphs as if same were set forth more fully at length herein.

73. Defendant's liability to Plaintiff arises from transactions in which Defendant obtained money by false pretenses, false representations, and actual fraud.

74. Specifically, when Defendant accepted the proceeds of the Horseshoe Lane and Rockwell Road Mortgages from AWL Defendant represented that she was agreeing to a recorded lien of first priority against the respective properties, which induced AWL to disburse the loan proceeds and Chicago to issue Policies insuring the Mortgages as recorded instruments.

10

75. Due to the aforementioned collusion, Defendant knew at the time she applied for and signed the Mortgages that they were not going to be recorded as liens against the properties.

76. When Defendant Mazik sold the Horseshoe Lane and Rockwell Road Properties—which were not arms' length transactions--she failed to disclose the unrecorded mortgages to Chicago's title agent, and instead accepted full disbursement of the net sale proceeds, thus purposely failing to pay off the balances she owed under the Notes.

77. As a result of Defendant Mazik's fraudulent representations and omissions, Chicago suffered damages.

78. For the foregoing reasons, Defendant's liability to Chicago is not dischargeable under 11 U.S.C. §523(a)(2)(A).

## SECOND CLAIM FOR RELIEF UNDER 11 U.S.C. §523(a)(6)

79. Plaintiff repeats and realleges the preceding paragraphs as if same were set forth more fully at length herein.

80. Based on each and every fact and statement alleged above, Defendant acted deliberately, intentionally, wrongfully, willfully, maliciously, and without just cause and without excuse as to AWL and Chicago.

81. Defendant's malicious and willful fraudulent conduct caused the losses suffered by Chicago in the principal amount of $1,018,702, together with interest, costs, attorneys' fees, and other damages to be established according to proof.

82. Defendant's liability to Chicago arises from conduct in which she intentionally committed wrongful acts in the procuring of loans which she knew were not going to be recorded and thus secured by real property, and that she did not pay off the loans when the properties were sold, despite receiving monies from the sale of the properties.

83. Defendant's actions necessarily caused the aforementioned injuries, and were done without just cause or excuse, as Defendant intentionally performed the acts and knew the non-payment of the aforementioned Notes would lead to losses by the Lenders and/or the insurer.

84. For the foregoing reasons, Defendant's liability to Plaintiff, in the principal amount of $1,018,079 is not dischargeable under 11 U.S.C. §523(a)(6).

## PRAYER

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant, as follows:

1. That the Court determine that the debt in the sum of $1,018.079, together with interest at the legal rate is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and/or §523(a)(6);

2. For an award of attorneys' fees as allowable by the law and in an amount the Court determines to be reasonable;

3. For costs of suit herein incurred; and

4. For such other and further relief as this Court deems just and proper.

FIDELITY NATIONAL LAW GROUP

Dated: July 2, 2018

/s/ *Dana B. Ostrovsky*
DANA B. OSTROVSKY
Attorney for Plaintiff,
CHICAGO TITLE
INSURANCE COMPANY